I would like to reserve five minutes of my argument for the end. Okay. Watch your clock. Esteemed Justices of the Ninth Circuit, I'm here to argue that this Court, the Ninth Circuit, should uphold the District Court's ruling reversing the contempt findings and determining the appropriateness of a money judgment and order, instruct the Bankruptcy Court to immediately release Kenneth Gharib from custody. Your Honors, I've been a bankruptcy lawyer for more than 35 years, and I have never in my time seen an Article I court order the incarceration of an individual in Chapter 11, Chapter 13, Chapter 7 cases. This case deals with fundamental issues of due process, enforceability of oral temporary restraining orders, and contempt sanctions versus monetary sanctions. Can I ask you one question? Has he ever come forward and just said he's not able to provide the asset and presented that to the Bankruptcy Court as an alternative basis for his sanction? My understanding is, Your Honor, and I haven't been involved in all of the steps of this case, but my understanding is that he has on multiple occasions come to the Bankruptcy Court and said, I want to raise the defense of impossibility. I don't have the money, didn't have the money, I've been incarcerated for six months, one year, a year and a half, so on and so forth. So how often do they check in with him? My understanding is that there are fairly frequent status conferences, maybe every several months, but despite the evidence that has been provided to the Bankruptcy Court, and I guess much of this is not in the record, the bankruptcy judge has not been convinced that the impossibility defense. I mean, basically, the impossibility defense, you have to prove a negative. Right. But you're saying that in these statuses, I take it they're by telephone or something, or is he brought in before the court? Actually, I believe that Mr. Grebe is actually brought before the court. Okay. So he has the opportunity, or you're telling me that he actually has gone to the court and said, I can't get this property that is in Iran, I can't do it, it's not possible for me to turn it over, and that's just been rejected by the bank? Actually, the property in Iran is, let's put that over here and talk about it in the sense that the argument is that the Chapter 7 trustee has not done any investigation into the property in Iran, so on and so forth, and as a matter of fact, filed a motion to abandon that property under one of the provisions of the Bankruptcy Court code, claiming that it's of inconsequential value or benefit to the estate, which was opposed by Mr. Grebe and the Bankruptcy Court granted that motion. But with regard to the money, the Chapter 7 trustee has had every opportunity to examine the bank records of Grebe, of EMM, of Domness, of Developments, the names of these companies. I don't get them exactly right. Well, basically from reading these opinions, it seems that they don't, the court doesn't believe that there was actually a transaction in Iran, a purchase of property, and so it's sort of found that there wasn't this purchase of property, so it can't, even though the deed's been turned over, you're saying they need to do more? What I'm saying is I don't believe enough was done at the inception. And furthermore, getting back to the impossibility question which Your Honor had first brought up, I believe that Mr. Grebe has demonstrated not only by the two years that he's been in Federal prison, but by virtue of bringing facts before the Bankruptcy Court that he, that he. Well, but the court's, the court just is checking with him. And you are having hearings and the court is finding against Mr. Grebe, I guess, at this point, saying either I don't believe that, you know, that it was some sort of sham transaction or you could get us the money but you're not getting us the money and back to the who's cow. Yeah. So what evidence is there that Grebe did not know the case had been converted from Chapter 11 to Chapter 7? Well, this gets into this really interesting issue of whether an oral injunction can serve as the basis for anything really. In this particular case, as we know, there was a hearing before the court on a motion for an entry of final decree. Mr. Grebe contends that he had divested himself of his stock months earlier. Well, there's kind of, correct me if I'm wrong, there's two ways that the Bankruptcy Court could have held Grebe in contempt of court. One, for violating the court's TRO and for failing to execute his statutory obligations once the case was converted from 11 to 7. And so you've got the TRO and then you've got the other one. The point, you have the TRO and you have the turnover. Judge Wu determined on appeal that based on the Hansborough decision, even if you uphold the Bankruptcy Court's findings of fact that Grebe did have notice, which, you know, stand here, I know all the players. I've known them for many, many years. So can you do the timeline? So the oral hearing. So what you have is you've got this transaction that I guess is in March of 2013 or whatever. And under this transaction, once the seller in Iran provides certain proofs, the monies are going to go from the account in Freedom, the Freedom account, and it's going to go to these other accounts where Grebe will not have control. He'll have to take his name off of the accounts. And that gives the ability of the debtor to ensure that the transfer of the deed takes place. And so August 13, August 14, these are the critical dates. But at any rate, on August 14, there's a hearing on a motion for final decree. And the tentative ruling that was issued the prior day, and bankruptcy judges, many of them are very, very good about issuing tentative rulings, so you have an idea of what you're in store for the next day. That tentative ruling doesn't say anything at all about any potential conversion to 7 or any turnover or any contempt or anything like that. The judge has some questions about whether creditors have been paid and the U.S. trustee files an objection saying we want our quarterly fees paid, rather typical things. And Grebe is not present, and Grebe is not represented by debtor's counsel. And during that hearing, and the Court has the transcript of the hearing, the judge kind of ---- To focus on Grebe is not represented. Now, why was he no longer being represented? He was never represented. The debtor was represented by counsel. Grebe was at one time the principal of the debtor, but he maintains that many, many months before that, he had transferred his stock to his brother, Rashtabadi. So Douglas represented the debtor, but he was the principal of the debtor, the principal, right? Grebe was throughout most of this case the principal of the debtor, but at the time of the hearing on the motion for final decree was no longer. Can I ask, going back to Judge Callahan's question, that's Judge Callahan. I should probably be in this. Right, you can switch. The elder Judge Callahan. He did get, of course, a hearing subsequent to the TRO. So he originally claims, I had no idea the TRO came through, but then there's a hearing and there's evidence presented. So let's assume that he didn't, let's just, for sake of argument, assume he didn't have notice. But by the time he goes before the judge, now the judge is saying, give me the $1.4 million back. You violated it. Now you know that there's a TRO. The money was gone. Okay, but then that's my first question that triggers my next concern. Why isn't he then saying the money's gone, I don't have the ability, it's an impossibility defense? He has. He said that. Okay. He has said that. And the judge is rejecting that. The judge is rejecting that. The judge is rejecting that on credibility grounds and has made a very thorough record about why he believes. One hearing that I appeared at where it came up, the judge said, Mr. Grebe, I want you to bring in other people. I want you to bring in other people that are going to corroborate that you have nothing. But yet the trustee cannot point to a bank account where there's money. I mean, and the trustee has done, has taken the acts of tracing where these monies went. And it's zero. Everywhere it's zero. So is your due process allegation not the length of him being incarcerated, but rather that he didn't have due process during that hearing where the judge held him responsible for turning over the money? The due process issue relates to the fact that he was not present in court, that it was an oral TRO. Oh, for the TRO, though. Right. But if we jump over the TRO and we get to the hearing where the judge found the TRO is in place, you're standing in front of me now, turn over the $1.4 million. Now, what's the due process violation there? At that point, the money is gone, clearly gone, because that takes place, I believe, roughly in March of 15. So what's the due process violation? The due process violation is at the inception with regard to the oral TRO. Okay. And, you know, can an oral TRO be in effect? And many courts say, well, if it's, you know, if it's immediately put into an order, but even then you have Mr. Grebe saying, I never received the written. Okay, but let's assume hypothetically. Let's buy your argument on the initial TRO and say he wasn't noticed of all of that. But then he does come to court and it says, okay, we're going from the Chapter 11 to the Chapter 7, turn over the property. Okay. And you're saying his excuse is, I don't have the property. But the judge says, I don't think, I don't believe you. I think you do have the property and you're pulling shenanigans and this, that. Let's assume, and the record does seem to indicate the judge doesn't believe him. Why can't that support being held in contempt? Okay. Because there's not a due process violation on that. Because by that time the money is gone, Your Honor. Well, but what if the judge doesn't believe that? And what if the findings are such that would support, because there are things in the record, if the judge doesn't believe that? So you mean to tell me, Your Honor, that in that particular case where you're dealing with an issue of impossibility and you've got someone who says, you know, here's my pockets, I've got nothing, check everything, I've got nothing, and the judge, I don't believe you. So that means that someone should remain in prison, incarcerated, for the rest of their life. Because one individual, who I happen to admire and respect greatly, does not believe. Well, judges make credibility calls. I mean, I'm just saying, if in fact the credibility call is supported, does that defeat your argument? Beyond the record here, I don't believe it's, based upon what I know, I don't believe it's supported. But that is really not, I mean, this appeal here really relates to the contempt finding itself and not the impossibility defense. Well, right. So the question is whether keeping him in prison is coercive or punitive. Right. That is an issue. And basically what Judge Wu determined was that contempt, that this case, Judge Albert's ruling, the bankruptcy judge's ruling, could not withstand a Hansborough analysis, i.e., a definitive order, notice that if you didn't obey, you would be held in contempt, and the contempt sanction. And Judge Wu concludes that Judge Albert believes that the ruling that he made orally, because I have some real problems with the attorney who represented the debtor. So let's put that aside. Okay. Just put the TRO aside. We're really focused now on the contempt for failing to execute his bankruptcy code obligations. And unclear to me whether at the time he sold the Hillsborough house and his wife executed the agreement for the Newport Beach house, whether those funds are his or his wife's and where they are. I'm having a little difficulty with Your Honor's question. Well, remember he made those bank transfers? Yeah, it was a Hillsborough property in San Mateo. Right. And that was sold. And then the proceeds, according to Mr. Greave, were used to purchase some property in Iran. That's what he says. That's what he says. The timing of that vis-a-vis the Newport Beach rental that's signed by his wife and the withdrawals of money from his bank account. Right, right, right. The $300,000. It's a little suspicious, you know, that timing. Well, in Mr. Greave's mind, this is before, of course, he had resigned as the principal of the debtor. In his mind, he had done a tremendous thing. He had sold the San Mateo property, the Hillsborough property, for much more than he thought he could get for it and so that there was excess proceeds available to pay creditors. In his mind, almost all the creditors, remember when the sale occurred, the secured creditor got paid. That was Bank of America. The question I have really I'm struggling with, and you're over your time. You have 25 seconds left, but I'll give you time in a minute because this is a question also for the government and the trustee. I mean, at this point, it seems as though the government should be, the trustee should be suing him in an adversary action to get the money back and unwind these transactions because it is clear he's not going to pay. And that was Judge Wu's point. He relied on the Newman case. He concluded that there was not sufficient support for contempt in this case. And so instead of looking at 105, 11 U.S.C. 105, the all powers statute, he looked at 542, the turnover statute. And he says, if you look at the cases that are cited, I think it was Knauss and Abrams that are cited by Judge Alberts in support of this, those two cases are automatic stay cases. They have specific contempt provisions. 542 does not. In this particular case, the findings are insufficient to support contempt. Therefore, you have the option of a money judgment. And we understand that. Money judgment, okay, and immediate release. Thank you. I'll see what the government has to say. All right. Thank you. I'll see what they say about this. Because, I mean, obviously you can't hold him there indefinitely. It's been two years. He's not going to pay. So what's your position? Good morning, Your Honor. Kathleen McCarthy, Law Offices of Thomas H. Casey. Also in the courtroom is my associate, Steve Burnell, and counsel for the creditor of the bankruptcy case. To start with, Your Honor, it is not the incarceration order that is on appeal before this court today. That order, which was entered on May 12, 2015, was never appealed. They could have. This order was entered in March of 2015. This was in May. There was a continued hearing to see if he would have abided by that March 23rd order that is the subject of this appeal. They never appealed the second order. So incarceration is not before this court. Also, you had requested or you had asked about the impassability defense. There has been many hearings on that, including the May 12th hearing where the incarceration took place. Of 2015. Of 2015. My question was whether it's been coming up again since then. Many, many, many times. And Mr. Garib has been brought back to the court many, many times, including you had asked about the BEC money, the $1.9 million that was used as shown to the landlord to show that his wife could afford the housing. Can I just go back to you saying what's not on appeal? I mean, he's appealing the finding of contempt, right? Yes. And the finding of contempt led to his incarceration. That was the sanction. Yes. So how are you breaking those apart? I mean, if he was wrong in finding him contempt, he shouldn't be in jail, right? Well, there's also the fact that we actually went and sought a second contempt order. And that contempt order was appealed, and that appeal has been dismissed. Right. And that was a while ago as well. So I guess if you were to look at this case, just imagine taking it in a criminal context for a moment. If he were to have committed obstruction under criminal contempt, he'd face under the federal sentencing guidelines for the bankruptcy court probably less than two years or maybe two years. And then he'd be capped at a statute of limitation. I mean, the statute, maximum statute penalty of maybe five years, I think, under 1512 or some obstruction statute. So at what point is this contempt order turning into a punitive one, especially when it's clear to everyone that there's no money that's coming in? And I would disagree with it. It's clear to everyone that no money is coming in. Well, there's no money coming in. There was money that existed. And, in fact, the day he sat on the bench, on the witness stand, and said, I have no money, at the contempt hearing on May 19th, he sat there and said, I have no money. It is impossible. That very day, somebody went into the bank under his orders and his directions, because the bank wouldn't transfer the money otherwise unless they had Mr. Grebe. On an account, the BEC account, he was the sole signator on, $604,000 was transferred to another account where Mr. Grebe. Why is this contempt and not why aren't you taking up a criminal action or an adversary proceeding? And why is this contempt? If he wasn't present at the moment, this thing was converted. He had notice of the order. He had notice of the order. He had notice that it was a definitive, specific and definitive order with specific terms. And he was told. When he had notice, what notice are you referring to? He had notice through his telephone calls with Dana Douglas, the attorney for the debtor, and e-mails from Dana Douglas to his. Let's talk about Dana Douglas's declarations. One thing they told me about those is how she kept changing her declaration. You have to put that into perspective of the timing of all this. Thomas Casey was not appointed trustee until the written order was entered, because, you know, at the time the U.S. trustee's office was at the hearing. But you didn't have a trustee because you didn't need a trustee. Yeah, you have to put one in and everything. Our office immediately went into mode and started calling and doing everything and trying to find out what was going on and who was what, where, when, and how. And so we did what we could. We got Mr. Grebe to come in. The hearing was on a Wednesday, August 14, 2013. By Monday, August 19, 2013, we had Mr. Grebe under oath finding out what's going on. He had transferred those monies out of the Freedom account that had been told by everybody, that's what is it. He knew that he transferred that money out. We did not know. We didn't know about transferring the money out until much later. I was the one that actually called the bank and was able to find out that the account had been closed. It took us time to get that information. We had to get the debtor in possession account, which was the only one that we had any access to without a subpoena. We then had to subpoena the Freedom account and everything. During this time period, we're trying to figure out what's going on. We're asking Dana Douglas about information. We're thinking about, well, if the buyer didn't have notice of the bankruptcy, maybe we can get the property back easily, maybe it's still property. All these things are swirling around. How long are you going to keep them there? I mean, at what point is the $1.4 million obviously not coming back to you? Is it indefinite? Is it three years? Is it five years? Is it seven years? Given that this wasn't an issue on this appeal because incarceration order was never appealed, and so the impossibility of defense? We don't agree with that. Okay. We believe when he can, at least me, when he appealed the contempt, that includes the sanctions for contempt. Well, if we say there was – if we say the contempt wasn't properly, then you can't keep him in jail. We have a second contempt order that he continues to violate. Well, then you've got to – but you can't – if we say it wasn't properly done, then he's not in jail on this one. Correct. Okay. So they are intertwined, whether you like it or not. But what's the end game here? That's what we're asking. The end game is to coerce Mr. Garib to give the money back. We know that even though he sat there on the witness stand and said, I had no money, that very moment $604,000-plus was being transferred from one account that he was sole signatory to another. So we know he had the money. Counsel, I realize that. And it comes really clearly through all your briefs and the anger with it. Sorry. So we realize that. Okay. So Judge Wu upheld this under Section 542. Can you just explain to me why the proceeds from the Hillsborough House was money that was subject to Section 542? It was actually an admitted point by Garib's counsel at the original contempt hearings and everything that the money in the Freedom account was the proceeds from the sale of the Hillsborough property and was property of the bankruptcy estate. It was in the original TRO contempt where he wasn't present? No. In the second contempt. In the order to show cause motion, everything. You have to remember, this all happened the critical hearing date where he was not present and says he doesn't know anything about it, that he took the money out before he knew that the judge ordered him to take the money out. It was a coincidence that the Iranian property was closing right then. But that happened in August of 2013. That order went up on appeal, and there wasn't a ruling from the We did not file our motion for OSC until October, November of that year. And during that time period when you were asking about the Dana Douglas' and her declarations, we realized when they filed the motion for reconsideration and the appeal of the original order that her testimony, by then we knew that the money had been taken out of the Freedom bank account. Okay, but you didn't answer the question yet. The question was when was the stipulation that this was part of the? That was in response to the order to show cause motion. When? In December of 2014, and also in their briefs before the May, I'm sorry, the March evidential hearing. I'm having a hard time. So he was the principal. So how do you prove that that money actually belonged to the debtor and not to him? It's a sale of a house. How did you prove that? It was the title to the house was in the name of the debtor. Okay. He was the principal of the debtor. That money went from escrow, closing the house, to the debtor's account and then went to the Freedom bankruptcy account. And when we had this OSC, we had many hearings, many things, evidentiary hearings, everything. He admitted that the money in the Freedom account that was there on August 14, 2013, the day the judge converted the case, was property of the bankruptcy estate. That $1.4 million that was in the Freedom account was property of the bankruptcy estate. As someone in control of property of the bankruptcy estate, you were obligated to turn it over. Okay. But you obviously that, you know, that you're a strong advocate for your position. You obviously don't believe that Mr. Garib has probably one ounce of good faith in him. So that being said, what, I mean, is, are you, is it your thought or position that Mr. Garib's endgame is to just drag this on and drag this on until someone finally lets him out and then he gets out, and then if he can hide the money, then he goes through bankruptcy and then he can go to Europe and live on wherever that money is? Is that, is that what? Yes. He thinks that $1.4 million is worth staying in jail for a little bit. In a case in Florida, there was a similar situation where someone was held in contempt and incarcerated. And from the published opinion at that point, that individual had been in prison for seven years. How long do you plan on keeping him in prison under this order? Go back to the court on a regular basis and have more hearings, and the judge has ruminated over this many times. Has anything changed? Nothing's changed. What happens is, for instance, we go back to court and find out that he transferred $604,000 the day he sat there on the stand telling the judge, I'm penniless, I have no money. So how do you believe somebody with that? I think he has control of his money. But that didn't change. That was in the past. That was the treaty. So are you continuing to look for the money? We have continued to look for the money a lot of times. So is that something that comes up at the? Yes. We have continued to continue on. So before the motion for order to show cause and everything, we had traced the money through December of 2013, okay? And at that point, monies went overseas. Just happenstance, the landlord, who had rented a $10,000-a-month home to his wife, was going through a foreclosure process or trying to eviction process and discovered our order to show cause rate contempt and showed up with the application and said, hey. And they said that they have this bank account called BEC at Wells Fargo and Bank of America. And so $1.9 million, what do you think of that? It's like, so we subpoenaed those banks. We got the bank records back and realized they came from the exact accounts that we had lost the money. So, you know, this all comes back around and all of a sudden. And we've been able to trace the money through to many other accounts. And as I said, these are all continuing on. We don't have the power of a criminal proceeding where we can just go in and seize records. We have to give a subpoena and notice. But if it was a criminal proceeding, like I said, he'd probably have served his time if he had pled guilty to it based upon a $1.4 million loss. And he'd be capped at least the statutory maximum for the statutory penalty for obstruction of a court order in the bankruptcy court. Well, there's also other federal crimes. And then he could have had restitution order of $1.4 million. Right. And actually, he has been reconvicted of what he talks about in his pleadings about having legal issues going on at the time of the sale of the Hillsborough property. What that was was an insurance and workers' compensation case. It actually came back up to this court. And he failed to provide the restitution that he said he would. So is he in custody for other things then? He will be when those. He isn't, though, right now. He's not right now. Okay. They're not doing concurrent or anything. And also, Mr. Grebe has served time before for fraud and for kidnapping. But that's irrelevant to the issue before the courts. How much coercion, how many years of coercion does it take? Well, I don't think. See, that's sort of the frustration, right, that you have to. He's not going to give you the money, right? So this is the legal argument. At what point is this punitive and you should be seeking alternative routes to the punishment as opposed to coercive, which, you know, it doesn't seem to be being very effective. And we have, Your Honors. And there's a lot of evidence that it would have come in if this was had to do with the impossibility of defense and incarceration and that we have developed that after this order was entered back in 2015. So those things would have come up. Could you still bring, I'm just wondering, does the statute run on the criminal charges? Your Honor, a bankruptcy trustee doesn't have the ability to file criminal charges. I mean, you could walk across the street and talk to the U.S. Attorney. Actually, well, Your Honor, it is a statutory obligation if a bankruptcy trustee sees a crime to report that. And Mr. Casey has abided by his statutory obligations. We have no control over that otherwise. So, you know, the fact that we've presented what we could to those who could bring criminal actions. All right. Thank you very much, counsel. I just want to go over one thing and then I'd like to go back into a few of the things that I was talking about earlier. Counsel talks about the $604,000. That was almost two years ago, a year and a half ago. Where's the money? It's been two years. One thing counsel didn't say is we've traced the money to here and here it is because they haven't been able to find it. Okay. So let's talk about first about the oral injunctive order and let's talk about some issues of law. Judge Wu says there appears to be no clear answer in the Ninth Circuit as to whether a litigant may be held in civil contempt upon notice of an oral injunction. However, several cases support the conclusion that a litigant may be held in contempt in such a situation, including the Fifth Circuit's decision in Bradley. And that's what he relies on. He relies on Bradley. However, in Bradley, Your Honors, I believe it is distinguishable from an instant case. First, in Bradley, the alleged contemnor, that was Butel, his counsel was present at the hearing and was even instructed by the bankruptcy court to take the lead in drafting the order. Second, in Bradley, the bankruptcy court concluded that Butel chose not to attend the hearing where the oral injunction was pronounced so that he would not have to testify about the pending sale. So that distinguishes that case from our particular case. Judge Wu goes on to say it would seem that the bankruptcy court's contempt order must be reversed if Hansborough accurately reflects the notice that appellant must have received as the bankruptcy court itself apparently felt was the case. I've taken a look at Hansborough. I've shepherdized it. It's a Ninth Circuit case. It remains good law. It was criticized by one bankruptcy court, but that was on another matter as to whether or not the contempt morphed into a non-dischargeability type of matter. But all of those go to the first TRO and whether he was present and not to the one where he was standing in front of the judge and the judge was making findings about his credibility. Well, remember, that hearing on the credibility was really a credibility battle. Was the judge going to believe the debtor's counsel or disagree? Right, but all of that case law that you cited goes to cases where there wasn't notice, right? That's where there is no notice. All that case law, Your Honor, goes to the hearing at the time that the judge issued orally issued the TRO that later, you know, a day or whatever became the order that we appeal from. And then with regard to the sanctions under 542, citing to Newman, Judge Wu noted that if a debtor demonstrates that he is not in possession of property of the estate or its value at the time of the turnover action, the trustee is entitled to recover a money damage for the value of the property of the estate. And that, Your Honor, is where we believe this matter should lie. There should be a money judgment and the bankruptcy court should be ordered to release Mr. Agriva immediately. All right, thank you very much. Thank you very much, Your Honors. Okay, Gary v. Casey will be submitted, and we'll take up United States v. DM.
judges: Wardlaw, Callahan, Kendall